IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TODD FENER, on Behalf of | § | |
| Himself and All Others | § | |
| Similarly Situated, | § | Civil Action No. 3:04-CV-1836-D |
| | § | (Consolidated with |
| Plaintiffs, | § | Civil Action No. 3:04-CV-1869-D |
| | § |   and |
| VS. | § | Civil Action No. 3:04-CV-2156-D) |
| | § | |
| BELO CORP., et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In these consolidated securities fraud cases that allege that
a corporation reported artificially inflated financial results
based on overstated circulation and advertising revenue of its
newspaper subsidiary, the question presented by defendants' motions
to dismiss is whether plaintiffs' second amended consolidated
complaint ("complaint") complies with Fed. R. Civ. P. 9(b) and the
Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15
U.S.C. § 78u-4, and states claims on which relief can be granted.
In its prior opinion in this case, *Fener v. Belo Corp.*, 425
F.Supp.2d 788 (Fitzwater, J.) ("*Fener I*"), the court dismissed
plaintiffs' first amended consolidated complaint ("first amended
complaint") but allowed plaintiffs to replead. *Id.* at 792-95, and
816. Concluding that plaintiffs' complaint rectifies as to three
of the individual defendants and the corporate defendant the
deficiencies of their first amended complaint that resulted in
dismissal of this action in *Fener I*, the court grants in part and

denies in part defendants' motions to dismiss.

I

These consolidated cases are a putative securities fraud class action involving common stock of defendant Belo Corporation ("Belo"). The proposed class consists of all purchasers of Belo common stock between May 12, 2003 and August 6, 2004. The lawsuits are based on the reporting of circulation for *The Dallas Morning News* ("DMN"), a Belo subsidiary, and of Belo financial results impacted by DMN's circulation figures and advertising revenue. Plaintiffs allege that defendants engaged in a scheme to overstate DMN's circulation and overcharge DMN advertisers so as to fraudulently inflate advertising revenue, thereby improperly recognizing revenue, artificially inflating the value of Belo's stock, and defrauding investors. They complain about alleged materially false and misleading statements in, and/or material omissions from, Belo's Securities and Exchange Commission ("SEC") filings, press releases, articles, conference calls, industry conference presentations, and analyst reports.

The defendants are Belo; Robert W. Decherd ("Decherd"), Belo's Chairman, CEO since 1987, and President since 1994; James M. Moroney III ("Moroney"), DMN's publisher and CEO since 2001; Barry Peckham ("Peckham"), who was DMN's Executive Vice President in charge of circulation at DMN until he resigned on August 5, 2004; John L. (Jack) Sander ("Sander"), Belo's President/Media Operations

since 2004; Dunia A. Shive ("Shive"), Belo's Executive Vice President; and Dennis A. Williamson ("Williamson"), Belo's Senior Corporate Vice President and CFO since 2004.  Plaintiffs allege that defendants are liable for violating § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. They assert as their second claim that the individual defendants are liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of Belo.

Belo is a media company that owns newspapers, television stations, cable news channels, and websites.  Belo's flagship subsidiary is DMN, a daily newspaper that at the time in question was responsible for over 60% of Belo's overall newspaper revenue and more than 30% of Belo's total revenue.  DMN derived 90% of its revenue from advertising.  Print advertising contracts contain incentives based on circulation, and advertisers pay more to place advertisements in newspapers with greater reported circulation. Advertisers also pay to place inserts in the Sunday paper, paying more for newspapers with higher circulation.

On August 5, 2004 Belo announced that DMN's reported daily circulation was overstated by 1.5% and Sunday circulation was overstated by 5%.  It admitted that for the six-month period ending September 30, 2004, total circulation would decline approximately 5% daily and 11.5% Sunday, compared with figures reported in

September 2003.  Defendants[1] also announced that defendant Peckham had resigned and that they were conducting an internal investigation.   Defendants stated that they would refund to advertisers all amounts that they had been overcharged as a result of the overstated circulation numbers.   Once DMN began reporting accurate circulation data in 2005, it revealed that it had suffered a 15% decline in daily and a 20% decline in Sunday circulation, which was the largest circulation decline of the top 10 newspapers in the United States from 2003 to 2005 and the largest decline of any paper with circulation exceeding 100,000.   After Belo made the announcements in August 2004, its stock price fell, and the first two of these lawsuits were filed within the month.

Defendants move to dismiss under Rules 12(b)(6) and 9(b), contending that plaintiffs have not satisfied the pleading requirements of the PSLRA and Rule 9(b).[2]  The parties have briefed the motions, and the court has heard oral argument.

---

[1]As in *Fener I*, "when the court refers to allegations that plaintiffs make against 'defendants,' it means that the assertion is made about defendants collectively, without naming them individually or differentiating among them."  *Fener I*, 425 F.Supp.2d at 793 n.7.

[2]All defendants except Peckham have also filed a motion requesting the court to take judicial notice of various documents, including SEC filings, transcripts of press releases and conference calls, a stock price chart, and excerpts from trade presentations. The court grants the motion.  *See, e.g., Fin. Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (addressing documents in addition to complaint and attachments that court can consider in deciding Rule 12(b)(6) motion).

II

"In order to state a claim under section 10(b) of the [Exchange] Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

> The PSLRA . . . requires the complaint to specify each allegedly misleading statement and the reason why it is misleading; if an allegation is made on information and belief, the complaint must also state with particularity all facts on which the belief is formed. Its pleading requirements incorporate Rule 9(b)'s fraud-pleading standard. That Rule requires a plaintiff to specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent.

*Fin. Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citations omitted).

> We have held that, pursuant to Rule 9(b), articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent, which is, as we have stated in dicta, the same standard required by the PSLRA under 15 U.S.C. § 78u-4(b)(1). Put another way, pleading fraud with particularity in this circuit requires time, place and contents of the false representations, as well as the identity of

- 5 -

> the person making the misrepresentation and
> what [that person] obtained thereby.  We have
> thus noted that, although the requirement for
> particularity in pleading fraud does not lend
> itself to refinement, and it need not in order
> to make sense, nevertheless, directly put, the
> who, what, when, and where must be laid out
> before access to the discovery process is
> granted.

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (quotation marks, brackets, footnotes, and emphasis omitted) (citing cases).

In deciding defendants' motions to dismiss, the court "accept[s] the facts alleged in the plaintiffs' complaint as true and constru[es] their allegations in the light most favorable to them." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003) (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).  The court does not, however, "'strain to find inferences favorable to the plaintiff[s].'" *Id.* (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996) (alteration in original).  "Nor [does the court] accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (citing *Nathenson*, 267 F.3d at 406).

                                    III

As a threshold matter, the court dismisses plaintiffs' claims against Sander, Shive, and Williamson.  In the complaint, Sander is not mentioned at all.  Shive is named several times as having

authored or signed a document or certification, made a statement, participated in a conference, or been responsible for establishing and maintaining Belo's disclosure controls and procedures, but no attempt is made to establish that she committed securities fraud. The complaint makes similar, but fewer, allegations concerning Williamson, and likewise fails to plead that he committed securities fraud. Plaintiffs' counsel confirmed at oral argument of these motions that plaintiffs have abandoned their claims against Sander, Shive, and Williamson. The actions against these defendants are dismissed with prejudice by Rule 54(b) judgment filed today.[3]

IV

Defendants contend that plaintiffs have failed to plead fraud with particularity, as required by Rule 9(b) and the PSLRA, and have engaged in impermissible group pleading. Peckham complains that plaintiffs have failed to establish that he made any public statements.

A

Defendants maintain that the complaint fails to satisfy the

---

[3]Additionally, because plaintiffs are not entitled to recover against Sander, Shive, and Williamson individually, they cannot recover against Belo based on their conduct. *See Fener I*, 425 F.Supp.2d at 798 (holding that plaintiffs could not recover against Belo based on conduct of Moroney, Peckham, or Sander because, in determining whether Belo made statement with scienter, court looked to state of mind of individual corporate official, and plaintiffs had failed to connect Moroney, Peckham, or Sander to oral or written misrepresentation or omission).

specificity requirements of Rule 9(b) and the PSLRA because it does not plead with the required particularity, it is conclusory, it does not plead specific facts that support the conclusions, and it mischaracterizes certain of Belo's statements.  They also posit that plaintiffs essentially repeat the same formulaic explanation for why a statement is a misrepresentation and what the individual defendants supposedly knew, without adequately alleging the specific details that suggest that defendants acted fraudulently.

Although the court agrees with defendants that the complaint is defective at some points for some or all these reasons, it nevertheless holds that plaintiffs have satisfied the pleading requirements of Rule 9(b) and the PSLRA to the extent necessary to withstand the motions to dismiss.  Plaintiffs have adequately specified the statements and omissions they contend are fraudulent, identified the speaker, stated when and where the statements were made, and explained why the statements were fraudulent.  They have met the requirement that they plead the time, place, and contents of the false representations, the identity of the person making the misrepresentation, and what the person obtained thereby.

B

Defendants also argue that the complaint relies on impermissible group pleading.

In *Fener I* the court held that plaintiffs had improperly engaged in group pleading when asserting claims against Moroney,

- 8 -

Peckham, and Sander. *Fener I*, 425 F.Supp.2d at 798. It concluded that plaintiffs had "failed adequately to connect them to the content of at least one of the SEC filings, press releases, conference calls, industry conference presentations, or analyst reports in question." *Id.* While plaintiffs have continued to engage in group pleading in the current complaint, *see, e.g.,* Compl. ¶ 17 ("Defendants went to great lengths to ensure the Paper achieved and reported during audits the prior year's circulation figures regardless of the actual circulation."), they have otherwise satisfied Rule 9(b) and the PSLRA to the extent necessary to avoid dismissal.

For example, the complaint asserts that Decherd prepared and signed Belo's SEC filings, issued statements in press releases, and led Belo's conference calls with analysts and investors. Compl. ¶ 68. It identifies SEC filings that he signed. *E.g., id.* at ¶¶ 69, 87, and 100. Regarding Moroney and Peckham, the complaint makes "specific factual allegations [that] link the individual to the statement at issue," that is, the complaint includes "particular factual allegations explaining the individual's involvement in the formulation of . . . that specific portion of the document [ ] containing the statement." *Southland*, 365 F.3d at 365. Plaintiffs allege that in various SEC filings, press releases, conference calls, industry conference presentations, and analyst reports, defendants reported false and misleading DMN

circulation figures, Belo operating revenues and earnings (or provided false and misleading earnings guidance), and reasons for changing circulation calculation methodology.  They aver that defendants knew when they did so that Belo had improperly recognized unearned advertising revenues based on overstated circulation figures that resulted in overcharges to advertisers. *Fener I*, 425 F.Supp.2d at 794.  The complaint ties Moroney and Peckham to the statements that form the basis of plaintiffs' securities fraud claims by alleging their involvement in providing inflated DMN circulation figures.  Plaintiffs repeatedly allege that Moroney and Peckham filled out the Newspaper Publisher's Statement that DMN filed with the Audit Bureau of Circulations ("ABC"), the main trade organization that publishes official circulation numbers used by advertisers to verify actual circulation. *E.g.,* Compl. ¶ 89.  According to the complaint, the Newspaper Publisher's Statement detailed every aspect of DMN's circulation, and Moroney and Peckham certified the accuracy of the statement.  Plaintiffs specifically aver that

> [e]very public statement by Belo, Decherd, Moroney and Peckham regarding [DMN's] circulation was derived from the Newspaper Publisher's Statement filed with the ABC and/or the meetings Moroney and Peckham had with their subordinates and each other.  Thus, Moroney and Peckham were responsible for every public statement made by Belo or Decherd regarding [DMN's] circulation —— including documents filed by Belo with the SEC.

*Id.* at ¶ 231.

Accordingly, the court holds that although plaintiffs' complaint continues in some respects to rely impermissibly on group pleading, it is not subject to dismissal on this basis.

V

Defendants next maintain that the complaint must be dismissed because plaintiffs have failed to adequately plead a strong inference of scienter.

A

"Scienter——a mental state embracing intent to deceive, manipulate, or defraud——is an essential element of a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) proscribes knowing or intentional conduct." *Coates v. Heartland Wireless Commnc'ns, Inc.*, 100 F.Supp.2d 417, 421 (N.D. Tex. 2000) (Fitzwater, J.) (citations and footnote omitted). "[T]o survive a motion to dismiss a securities-fraud action, plaintiffs must, *inter alia,* plead specific facts establishing a strong inference of scienter." *Fin. Acquisition Partners*, 440 F.3d at 287 (citing *Nathenson*, 267 F.3d at 407). "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 645 (5th Cir. 2005) (internal quotation marks omitted). "The PSLRA pleading standard for scienter is

- 11 -

especially challenging for plaintiffs." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696-97 (5th Cir. 2005).   "[P]ursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint." *Fin. Acquisition Partners*, 440 F.3d at 287 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

"For PSLRA purposes, plaintiffs may establish scienter by demonstrating . . . severe recklessness." *Fin. Acquisition Partners*, 440 F.3d at 287 (emphasis omitted).   Severe recklessness is

> limited to those highly unreasonable omissions
> or misrepresentations that involve not merely
> simple or even inexcusable negligence, but an
> extreme departure from the standards of
> ordinary care, and that present a danger of
> misleading buyers or sellers which is either
> known to the defendant or is so obvious that
> the defendant must have been aware of it.

*Nathenson*, 267 F.3d at 408 (internal quotation marks omitted) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. Apr. 1981) (en banc)).

"Circumstantial evidence can support a scienter inference." *Fin. Acquisition Partners*, 440 F.3d at 287 (citing *Nathenson*, 267 F.3d at 408).   The court "consider[s] all the facts and circumstances alleged to determine whether they, in toto, raise a requisite strong inference of scienter." *Goldstein*, 340 F.3d at 246 (citing *Abrams*, 292 F.3d at 430; *Nathenson*, 267 F.3d at 410). It "consider[s] any evidence of scienter pleaded by the plaintiffs cumulatively." *Id.* at 247.

- 12 -

"The PSLRA . . . requires that the complaint 'with respect to *each* act or omission alleged' to be false or misleading 'state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." *Southland*, 365 F.3d at 363 (quoting 15 U.S.C. § 78u-4(b)(2)).   Concerning the liability of the individual defendants, "[u]nder the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a corporate defendant.   Plaintiffs must also particularize intent allegations raising a 'strong inference of scienter.'"   *Goldstein*, 340 F.3d at 249 (addressing liability of corporation's Chief Executive Officer and Chief Financial Officer/Executive Vice President).

Regarding Belo's liability under § 10(b) of the Exchange Act and Rule 10b-5 as a corporate defendant,

> [f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment. This is consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not

- 13 -

> simply be imputed to that individual on
> general principles of agency.

*Southland*, 365 F.3d at 366 (citations and footnotes omitted).

### B

In *Fener I* the court addressed plaintiffs' first amended complaint and concluded for several reasons that plaintiffs had failed to adequately plead a strong inference scienter. *E.g., Fener I*, 425 F.Supp.2d at 802. In the first amended complaint, plaintiffs "appear[ed] to be relying on a theory of conscious misbehavior rather than severe recklessness." *Id.* at 801; *see id.* at n.13. Plaintiffs' present complaint, however, also relies on severe recklessness to plead a strong inference of scienter. Accepting the non-conclusory, specific factual allegations of the complaint as true, viewing them in the light most favorable to plaintiffs, and considering them cumulatively and *in toto*, the court holds that they at least give rise to a strong inference of scienter on the basis that Decherd, Moroney, and Peckham were severely reckless in not knowing that DMN's circulation was significantly overstated and that DMN was recognizing revenue that was not earned, and in reporting substantially inflated DMN circulation figures that caused Belo to report artificially inflated financial results to investors and the market.

Circulation data was critical to DMN's financial results. DMN derived 90% of its revenue from advertising. Higher newspaper circulation allowed DMN to charge higher rates to advertisers.

- 14 -

Compl. ¶ 30.   DMN's success had a significant impact on Belo's performance.   DMN represented 60% of Belo's publishing revenue and 30% of Belo's total revenue.   *Id.* at ¶ 59.

Because newspaper circulation significantly contributed to Belo's bottom line, Decherd, Moroney, and Peckham closely monitored DMN's operations and revenues.   *Id.* at ¶ 218.   Decherd was well aware of the importance of DMN's circulation figures to the overall financial health of Belo.   *Id.* at ¶ 219.   Moroney and Peckham were primarily responsible for circulation at DMN.   They knew that inflated circulation numbers would affect the financial results at Belo. *Id.* at ¶ 223.   Moroney and Peckham also knew that revenues at DMN accounted for 60% of Belo's revenue derived from newspapers and 30% of Belo's overall revenues.   Thus they knew that, because of DMN's impact on Belo's financial results, the artificially inflated circulation results would in turn artificially inflate Belo's publicly reported financial results.   *Id.* at ¶ 228.

In 1999 Peckham directed that DMN change its newspaper return policy to "non-returnable."   Compl. ¶ 11; *see also id.* ¶ 224. Normally, a newspaper calculates the number of newspapers sold by subtracting unsold newspapers returned by a distributor from the distributor's draw, i.e., the number of papers the distributor purchases.   After the non-returnable policy was implemented, distributors had no incentive to return unsold newspapers because they did not receive refunds for them.   *Id.*   Distributors did,

however, have other incentives to sell newspapers, such as free vacations for winning circulation contests. *Id.* at ¶ 23. The circulation incentives of paying bonuses for meeting circulation goals and giving away trips for winning circulation contests operated to induce distributors to understate the number of unsold newspapers left in their racks. *Id.* at ¶ 197. The inaccurate accounting of unsold copies led to higher circulation numbers and, therefore, higher revenues at DMN and Belo. *Id.* at ¶ 224. The artificially inflated circulation numbers caused advertisers to pay more to place advertisements in DMN, thereby artificially inflating revenues for the newspaper. *Id.* at ¶ 228.

On January 10, 2003, prior to a circulation audit scheduled for that month, a long-time DMN distributor sent Decherd a letter advising him that circulation managers had told him he would have to lie about the number of newspapers he had sold. Compl. ¶¶ 41 and 220.[4] The distributor also told Decherd that he possessed a dozen audiotapes of conversations instructing him to lie on circulation audit documents, and he included with his letter an audiotape from the prior week that included voice mail messages and conversations with a State Regional Manager and State Zone Manager in which he was told to lie about circulation figures. *Id.*

_____

[4]In *Fener I* the court held that the allegations regarding the distributor were inadequate to plead scienter as to Decherd. *Fener I*, 425 F.Supp.2d at 807. There, however, the court was analyzing this conduct solely in the context of a claim that Decherd had acted with conscious misbehavior. *Id.* at 806.

Decherd was severely reckless in disregarding that circulation at DMN was being artificially inflated.  *Id.* at ¶ 220.

The distributor also wrote letters and made telephone calls to Decherd, Moroney, and Peckham to express concern and complain about the pressure he was under to lie on the January 2003 audit by reporting fraudulently overstated circulation numbers.  *Id.* at ¶ 45.[5]  During the weeks that followed, Peckham and others repeatedly contacted the distributor, begging him to turn over the audiotapes, which contained damning evidence that distributors were being told to lie on the audit.  *Id.* at ¶ 47.

In early 2003, at the same time Decherd, Moroney, and Peckham were investigating the problems raised by the distributor who sent the audiotape and letter to Decherd, the former director of single-copy circulation at DMN approached Peckham with concerns that circulation numbers were being inflated by falsified returns.  *Id.* at ¶¶ 90, 98, and 225.  The former director informed Peckham that circulation was being artificially inflated.  This was true in part because there were no controls, and when distributors filled out their return sheets "they could put anything they wanted" as the

---

[5]In *Fener I* the court held that the allegations regarding the distributor were irrelevant as to Moroney and Peckham because, even if the court assumed *arguendo* that the averments were sufficient to plead that either or both knew of a scheme to inflate circulation figures, the assertions were irrelevant because neither defendant had been sufficiently connected to an oral or written misrepresentation or omission.  *Id.*  That deficiency has been remedied in the instant complaint.

return number.  *Id.*  This "non-returnable" policy provided no incentive whatsoever for distributors to accurately account for unsold papers.  When it became apparent that Decherd, Moroney, or Peckham were not doing anything to mitigate the artificial inflation of circulation, the director of single-copy circulation repeated his concerns to Peckham throughout 2003 and in early 2004. *Id.* at 225.

Decherd, Moroney, and Peckham investigated the questionable circulation practices.  *Id.* at ¶ 50.  Through this ongoing investigation, they realized that paying financial incentives to Circulation Directors of Operations, District Circulation Managers, Regional Managers, and Zone Managers was allowing DMN to report artificially inflated circulation.  *Id.* As a result of his receipt of the distributor's report and audiotapes, Decherd initiated a long-term investigation that revealed that DMN's ban on returns gave distributors no incentive to accurately report returns and that distributors were actually being instructed to underreport unsold copies to inflate circulation.  *Id.* at 221.  The investigation uncovered that annual bonuses ranging from $10,000 to $80,000 that were being paid to Regional, District, and Zone managers, and financial incentives paid to distributors, provided an improper inducement to report false circulation numbers.  Thus in May 2003 circulation bonuses were reduced for the September 2003 audit period.  *Id.*  The continuing investigation showed that even

reduced bonuses had the effect of inflating circulation. Realizing that the financial incentives paid to management and distributors, combined with DMN's non-returnable policy, caused circulation to be falsely inflated, Decherd, Moroney, and Peckham decided in September to eliminate circulation bonuses entirely for the March 31, 2004 audit period. *Id.* In May 2003 Assistant Circulation Director Linda Kozlowski stated that bonuses were being reduced for the upcoming September 2003 Publisher's Statement by almost 50%. *Id.* at ¶ 50. Later in 2003, after further investigation, Decherd, Moroney, and Peckham realized that merely reducing bonuses would only slow but not eliminate circulation inflation. As the investigation into the state circulation numbers continued, DMN canceled all financial incentives in September 2003. *Id.* at ¶ 51.

In the fall of 2003, ABC changed its accounting method at DMN and began using a longer period of time to measure unsold copies. In the second half of 2003, ABC lowered circulation figures for DMN. ABC's audit of Belo's April through September 2003 circulation revealed major discrepancies in the state circulation numbers. *Id.* at 226.

Decherd, Moroney, and Peckham were severely reckless in disregarding the falsity of the Belo public statements that are the bases of plaintiffs' claims. *Id.* at ¶¶ 90, 111, 119, 135, 144, and 158. Decherd was severely reckless in not knowing that Belo's publicly stated financial results were materially false and

misleading.   Decherd knew the artificially inflated circulation would cause artificial inflation of Belo's financial results because those results were derived, in large part, from the circulation results of DMN.   *Id.* at ¶ 222.   Regardless of this knowledge, Decherd issued public statements listing DMN's circulation and public financial statements containing artificially inflated financial results.   *Id.* at ¶¶ 220 and 222.   Moroney and Peckham understood that DMN used circulation figures to establish advertising rates that generated 90% of DMN's revenue.   Thus they were severely reckless in disregarding that DMN, and therefore Belo, was recognizing revenue it had not earned.   *Id.* at ¶ 39.

Despite their knowledge of the circulation overstatement in 2003, Decherd, Moroney, and Peckham waited until August 5, 2004 to reveal the circulation overstatement.   *Id*. at ¶ 221.   Even when Decherd admitted during an August 5, 2004 conference call that the financial incentives were responsible for the circulation overstatement and thus discontinued in the first quarter 2004, he did not reveal that he, Moroney, and Peckham knew about the adverse impact of the incentives in 2003 or that the decision was made to discontinue the bonuses in September 2003.   *Id.*

Although Decherd stated in an August 5, 2004 press release that he had ordered an investigation in June 2004 and that questionable practices were only reported to him in late July 2004, he and Moroney were well aware of DMN's business practices that

allowed DMN's circulation to be misrepresented. *Id.* at ¶ 5. Decherd, Moroney, and Peckham were severely reckless in disregarding that DMN's circulation was overstated. Furthermore, because of this knowledge, Decherd, Moroney, and Peckham were at least severely reckless in disregarding that DMN, and therefore Belo, was recognizing revenue that it had not earned. *Id.* at ¶ 40.

Belo admitted on August 5, 2004 that the circulation numbers reported for DMN were overstated by 1.5% for the daily paper and 5% for the Sunday paper. The sharp declines caused by inflated circulation numbers at DMN negatively impacted Belo because DMN represented 60% of Belo's publishing revenue and 30% of Belo's total revenue. *Id.* at ¶¶ 59 and 198. Ultimately, Belo reported a 15% decline in daily and a 20% decline in Sunday circulation from 2003 to 2005. It further disclosed it would not be able to restate 2002 and 2003 circulation data because the ABC had determined that DMN lacked adequate paper work to calculate accurate circulation data. Belo admitted that "most of the declines are due to overstatements," not as a result of a change in methodology or business trends. *Id.* at ¶ 60.

C

Viewed cumulatively and *in toto*, the complaint at least alleges a strong inference of scienter on the basis that Decherd, Moroney, and Peckham were severely reckless in not knowing that DMN's circulation was significantly overstated and that DMN was

- 21 -

recognizing revenue that was not earned, and in reporting substantially inflated DMN circulation figures that caused Belo to report artificially inflated financial results to investors and the market.

DMN's newspaper circulation was critical to its financial results because advertising prices were based on circulation, and 90% of DMN's revenue was derived from advertising. DMN's financial performance significantly impacted Belo's performance because DMN accounted for 30% of Belo's total revenue. Due to the significance of DMN's circulation to Belo's performance, Decherd, Moroney, and Peckham closely monitored DMN's performance. They knew that artificially inflated circulation at DMN would artificially inflate Belo's financial results.

DMN adopted policies and practices with distributors that created incentives to understate the number of newspapers left unsold and to overstate circulation. Artificially inflated circulation numbers in turn caused advertisers to pay more for advertising, thereby inflating revenues at DMN and Belo.

In January 2003 Decherd, Moroney, and Peckham became aware of claims that DMN circulation was being artificially inflated because circulation managers and distributors were lying about the number of newspapers sold. Although the distributor who made this allegation to Decherd stated that he refused to lie, Decherd was aware that a long-time DMN distributor was claiming that

circulation managers had repeatedly pressured him to falsify audit documents.  The distributor also complained to Moroney and Peckham. Peckham was one of several persons who begged the distributor to turn over audiotapes that evidenced the improper attempts to persuade him to lie on the audit.

The distributor's complaint was not an isolated instance in which concerns about the accuracy of DMN circulation were raised. Also in 2003 the former director of single-copy circulation expressed similar concerns, informing Peckham that circulation was being artificially inflated by falsified returns.

Decherd, Moroney, and Peckham initiated investigations of questionable circulation practices that uncovered that the payment of financial incentives to circulation managers was allowing DMN to report artificially inflated circulation.  The investigation that Decherd initiated revealed that DMN's ban on returns removed any incentive for distributors to accurately report returns and that distributors were being instructed to underreport unsold copies to inflate circulation.  Financial incentives paid to distributors provided an improper inducement to report false circulation numbers.  DMN later reduced and then eliminated circulation bonuses.

Once they learned of claims of inflated DMN circulation, its probable causes, and its impact on Belo's financial results, Decherd, Moroney, and Peckham continued to report inflated

circulation figures that were incorporated into Belo's public statements and recklessly disregarded the falsity of the statements. They did not reveal the overstated circulation until August 2004. The overstated circulation was significant, ultimately reaching 15% for daily circulation and 20% for Sunday circulation.[6]

Plaintiffs have thus pleaded specific facts that, assumed to be true and viewed favorably to them, allege highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers that is so obvious that defendants must have been

_____

[6]In *Fener I* the court rejected plaintiffs' reliance on the Fifth Circuit's decision in *Plotkin*, 407 F.3d 690, because plaintiffs had not alleged specific facts concerning the magnitude of the circulation overstatements that would permit the strong inference that Belo knew or was severely reckless in not knowing that circulation was being artificially inflated. *Fener I*, 425 F.Supp.2d at 810-11 n.22. The court pointed out that plaintiffs did not allege contextual facts that, viewed favorably, showed that overstatements in daily circulation of 1.5% daily or 5% on Sunday produced a similar expectation that Belo would be familiar with the circulation counting practices and resulting counts, and, in turn, that it knew or was severely reckless in not knowing that the numbers were inflated. *Id.* at 811 n.22. Unlike their first amended complaint, however, plaintiffs now assert that Belo ultimately claimed that its circulation during the class period was overstated by 5.1% for daily papers and 11.9% for Sunday papers. And once it started reporting accurate circulation data in 2005, it revealed that it suffered a 15% decline in daily and a 20% decline Sunday circulation, the largest circulation decline of the top 10 newspapers in the United States from 2003 to 2005. Compl. ¶ 3. Plaintiffs have therefore addressed the contextual deficiency noted in *Fener I*.

- 24 -

aware of it.  Because plaintiffs have adequately pleaded a strong inference that Decherd, Moroney, and Peckham acted with scienter, they have adequately pleaded that Belo acted with scienter. *Southland*, 365 F.3d at 366.

VI

Defendants next argue on several grounds that plaintiffs are alleging misrepresentations that are not actionable.[7]  They also maintain that the allegedly false financial results——improper recognition of $38 million in revenue due to overstated circulation——are not material.

Defendants have failed to present arguments that, if accepted by the court, would result in dismissal of plaintiffs' entire complaint.  Without suggesting that each predicate statement or omission on which plaintiffs rely is sufficient to obtain relief, the court holds that the complaint sufficiently alleges at least some statements or omissions that support a claim under § 10(b) of the Exchange Act and Rule 10b-5.  Accordingly, the court declines to grant defendants' motions on this basis, leaving for consideration on motion for summary judgment the question whether particular alleged misrepresentations or omissions are actionable.

The court also declines to dismiss the complaint on the basis that plaintiffs are relying on allegedly false financial results

---

[7]Peckham has adopted the other defendants' motion by reference and has therefore presented this contention as well.  Peckham Br. 2-3.

that are not material.  "Because materiality is a mixed question of law and fact, it is usually left for the jury."  *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996).  Although on a motion to dismiss "a court can determine statements to be immaterial as a matter of law," *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 359, the court cannot say on the basis of plaintiffs' complaint and defendants' arguments that each alleged misrepresentation is immaterial as a matter of law.

VII

Finally, the individual defendants move to dismiss plaintiffs' claim under § 20(a) of the Exchange Act for control person liability.  All individual defendants move to dismiss on the ground that plaintiffs have failed to plead a primary violation under § 10(b).  Peckham also maintains that he cannot be held liable as a control person because he was not a member of the Belo Management Committee and was not even a Belo officer.

Because the court has held, however, that plaintiffs have stated a primary violation, it concludes that the § 20(a) claim cannot be dismissed on this basis.  Nor can the court say beyond doubt, based on the complaint alone, that plaintiffs will be unable to prove that Peckham lacked the power to control Belo.  The court therefore denies the motions of Decherd, Moroney, and Peckham to dismiss plaintiffs' claim under § 20(a) of the Exchange Act.

\*      \*      \*

- 26 -

For the reasons stated, the court grants the motions to dismiss to the extent that it dismisses plaintiffs' claims against defendants Sander, Shive, and Williamson.  The court denies the motions to the extent they seek dismissal of defendants Belo, Decherd, Moroney, and Peckham.

**SO ORDERED.**

May 18, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE